UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------X
AMALIA RAMIREZ O/B/O                    **NOT FOR PRINT OR**
FULGENCIO ZETINO,                       **ELECTRONIC PUBLICATION**

                    Plaintiff,          **MEMORANDUM & ORDER**
                                        10-CV-03522(KAM)
          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
------------------------------------X
**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

plaintiff Amalia Ramirez ("plaintiff"), as successor in interest

to her deceased husband, Fulgencio Zetino ("Zetino"), appeals

the final decision of defendant Commissioner of Social Security

Michael Astrue ("defendant" or the "Commissioner"), who denied

Zetino's application for Social Security Disability Insurance

("SSD") and Supplemental Security Income ("SSI") benefits

pursuant to Titles II and XVI, respectively, of the Social

Security Act (the "Act"). Plaintiff argues that she is entitled

to receive SSD and SSI benefits on behalf of Zetino because of

Zetino's severe medically determinable impairments, including

right shoulder derangement, right knee derangement, diabetes

mellitus, hypertension, low back derangement/degenerative

spondylosis, psoriasis, and cervical/lumbar radiculopathy, which

plaintiff contends rendered Zetino disabled and prevented him

from performing any substantial gainful activity since October 2, 2000.  (*See generally* ECF No. 1, Complaint, dated 8/2/2010 ("Compl.").)  Presently before the court are the parties' cross-motions for judgment on the pleadings.  For the reasons set forth below, defendant's motion for judgment on the pleadings is granted and plaintiff's cross-motion for judgment on the pleadings is denied.

**BACKGROUND**

**I.   Procedural History**

Zetino filed applications for SSI and SSD benefits on March 27, 2003 and April 10, 2003, respectively, claiming that he was disabled since October 2, 2000.  (*See* ECF No. 19, Administrative Transcript, filed 4/28/2011 ("Tr."), at 49, 91-93.)  Zetino's applications were denied, and he requested an administrative hearing.  (*See id.* at 49, 65.)  Zetino and his attorney appeared before Administrative Law Judge Manuel Cofresi (the "ALJ") on August 9, 2005 and February 21, 2006.  (*See id.* at 837-62, 863-80.)  On April 27, 2006, the ALJ issued a decision concluding that Zetino was not disabled within the definition of the Act.  (*Id.* at 50-64.)  On June 5, 2006, Zetino sought review of the ALJ's decision by the Appeals Council. (*See id.* at 68-70.)  On June 29, 2006, however, Zetino died, and his widow, plaintiff Amalia Ramirez, substituted herself for the

remainder of the administrative proceedings.  (*Id.* at 81, 789A.)[1]
On July 31, 2007, the Appeals Council vacated the ALJ's decision
and remanded the case for, *inter alia*, further consideration of
certain evidence and further development of the record.  (*See
id.* at 83-88.)

        The ALJ held a supplemental hearing on August 5, 2008.
(*See id.* at 802-36.)  On September 12, 2008, the ALJ issued a
second decision, which upon *de novo* review of the record, found
that Zetino was not disabled at any time prior to his death.
(*Id.* at 13-32; *see also id.* at 17 ("A *de novo* review of the
total record was conducted."); 805 (stating that ALJ would
review the record *de novo* and "reevaluate the evidence").)  On
June 4, 2010, the ALJ's decision became the final decision of
the Commissioner when the Appeals Council denied Zetino's
request for further review.  (*Id.* at 5.)

        Plaintiff filed the instant action on August 2, 2010,
alleging that she is entitled to receive SSI and SSD benefits
due to Zetino's severe medically determinable impairments,
including right shoulder derangement, right knee derangement,
diabetes mellitus, hypertension,[2] low back

---

[1] A claimant's spouse may receive payments due to a deceased claimant.  *See* 42
U.S.C. § 404(b); 20 C.F.R. §§ 404.503(b), 416.542(b).

[2] Hypertension, or high blood pressure, is high pressure or tension in the
arteries.  A systolic pressure above 140 with a diastolic pressure above 90
is considered high.  High Blood Pressure (Hypertension), MedicineNet.com,
http://www.medicinenet.com/high_blood_pressure/article.htm (last visited Feb.
3, 2012).

derangement/degenerative spondylosis,[3] psoriasis,[4] and cervical/lumbar radiculopathy,[5] which plaintiff contends rendered Zetino disabled and prevented him from performing any substantial gainful activity since October 2, 2000. (*See* Compl. ¶¶ 5-6.)  In her Complaint, plaintiff alleged that the ALJ's decision was erroneous, contrary to law, and not supported by substantial evidence in the record. (*Id.* ¶¶ 15-17.)  Defendant moved for judgment on the pleadings on March 16, 2011. (*See* ECF No. 14, Notice of Motion for Judgment on the Pleadings, dated 3/16/2011; ECF No. 15, Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings, dated 3/16/2011 ("Def. Mem.").)  Plaintiff filed a cross-motion for judgment on the pleadings on April 11, 2011. (*See* ECF No. 16, Notice of Motion for Judgment on the Pleadings, dated 4/11/2011; ECF No. 17, Plaintiff's Memorandum of Fact and Law in Support of His Cross-Motion for Judgment on the Pleadings, dated 4/11/2011 ("Pl. Mem.").)  Defendant served plaintiff with its reply, and the fully briefed motions were filed, on April 28, 2011. (*See*

---

[3] Spondylosis refers to "[d]egeneration of the disc spaces between the vertebrae." Definition of Spondylosis, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=13959 (last visited Feb. 3, 2012).

[4] Psoriasis is "a noncontagious skin condition that produces red, dry plaques of thickened skin." Psoriasis, MedicineNet.com, http://www.medicinenet.com/psoriasis/article.htm (last visited Feb. 3, 2012).

[5] Radiculopathy is "a condition due to a compressed nerve in the spine that can cause pain, numbness, tingling, or weakness along the course of the nerve." Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (last visited Feb. 3, 2012).

ECF No. 18, Reply Memorandum of Law in Support of Defendant's

Motion for Judgment on the Pleadings and in Opposition to

Plaintiff's Cross-Motion, dated 04/28/2011 ("Def. Reply").)

## II.  Summary of Personal, Employment, and Non-Medical History

Zetino was born in Guatemala on April 21, 1959, and he

immigrated to the United States in 1980.  (Tr. at 840.)  From

1986 through October 2000, Zetino worked in a painting factory,

where he painted heavy machinery.  (*Id.* at 841.)  As a painter,

Zetino used machines, tools, equipment, and his own technical

knowledge and skills.  (*Id.* at 96.)  Zetino walked, stood, and

climbed for eight hours per day; handled, grabbed, or grasped

big objects for eight hours per day; and stooped, kneeled,

crouched, crawled, and reached for four hours per day.  (*Id.*)

Zetino indicated that he did not sit, write, type, or handle

small objects at all.  (*Id.*)  Zetino lifted and carried pieces

of equipment and machines over fifty feet each day, and the

heaviest weight he would lift was 100 pounds or more.  (*Id.*)

Zetino stated that in the course of his duties as a painter, he

frequently lifted fifty pounds or more.  (*Id.*)  Zetino also

indicated that he "used to do construction."  (*Id.*)

Zetino had an eleventh grade education,[6] and he never

completed any type of special job training, trade, or vocational

---

[6] Zetino stated at his August 9, 2005 hearing that he attended school in
Guatemala only through the sixth or seventh grade.  (Tr. at 840.)

school.  (*Id.* at 100.)  Zetino stated that he was unable to read or write in English and that he spoke Spanish at home to his wife and at work.  (*Id.* at 840, 847.)  Zetino acknowledged, however, that he had completed forty hours of English instruction in the United States and was able to "speak a few words" of English.  (*Id.* at 851-52.)  Zetino married plaintiff on May 14, 2004, and they resided in Jamaica, Queens.[7]  (*See id.* at 79, 839-40; Compl. ¶ 1.)

On October 2, 2000, Zetino injured his right knee during a slip and fall accident at work.  (*Id.* at 95, 130, 841-42).  According to the Complaint, Zetino had been unable "to perform any substantial gainful activity, due to his medical condition" since the date of his accident.  (*Id.* at ¶ 5, 6.)  In a disability report dated April 10, 2003, Zetino stated that because of his accident, his knees locked and he could not stand for long periods.  (*Id.* at 95.)  In a disability report dated May 8, 2003, he stated that whenever he moved, he had "permanent" stabbing pain in his right knee that radiated down the leg to the foot.  (*Id.* at 125-26.)  He stated that he used a cane and knee brace, and that he had difficulty lifting, standing, walking, climbing stairs, kneeling, squatting, and seeing.  (*Id.* at 122-23.)  His day consisted of eating breakfast, lunch, and dinner, taking a shower, watching

---

[7] Zetino also stated that he lived with his adult son.  (Tr. at 117, 840.)

television, reading, and feeding his pet bird and fish. (*Id.* at 118, 121.) Zetino stated that it took a lot of time to tend to his personal needs and that he could not stand on his feet to shave or shower. (*Id.* at 118, 120, 127.) He did not cook, shop, or do house or yard work. (*Id.* at 119-21.) He reported that he went outside three times a week, (*id.* at 119), but he could not see friends or go to church or stores, (*id.* at 127.) He could walk one block at a time and then had to rest for three minutes. (*Id.* at 123.)

At a hearing before the ALJ on August 9, 2005, Zetino testified that he had pain in his shoulder, waist, and knee. (*Id.* at 843.) Zetino also stated that he could not "carry anything because [he had] three parts of [his] body that are damaged." (*Id.* at 844.) Zetino testified that he could sit for 15 to 20 minutes but then had to move because of the pain. (*Id.*) Zetino used a brace on his right knee and he "ha[d] to have it on . . . at all times." (*Id.*) Zetino also used "a certain assistive device that [had] metal rods so that [his] right knee would] not move" while he slept. (*Id.* at 844-45.) Zetino took a taxi to the ALJ hearing, and he testified that on "a good day," he was able to "walk very slowly to the bus." (*Id.* at 845.) Zetino was also able to take a two-month trip to Guatemala in December 2004 and he could sit in a car for two hours to and from Atlantic City. (*Id.* at 853.)

Zetino testified that, if he did not take his medication at night, he would wake up every half hour because of the pain.  (*Id.* at 846.)  In his home, Zetino's wife did activities such as cooking, cleaning, food shopping, and laundry; Zetino testified that he was no longer able to clean or sweep.  (*Id.*)  Zetino stated that his wife also assisted him with bathing.  (*Id.* at 846-47.)  During the day, Zetino would watch television and listen to music.  (*Id.* at 847.)  Zetino would also lie down for approximately an hour during the day. (*Id.*)

## III. Summary of the Medical History

### A.  Zetino's Orthopedic Impairments

The record contains the following medical evidence regarding Zetino's orthopedic impairments.  After his October 2, 2000 workplace injury, x-rays of Zetino's right knee were taken on October 5, 2000. (*See id.* at 176.)  This examination revealed suspected fluid in the suprapatellar bursa,[8] but Zetino's bone density was normal, and no fracture or dislocation was observed. (*Id.*)  On October 6, 2000, Zetino began to see Dr. Arthur Gray ("Dr. Gray").  (*See id.* at 192.)

---

[8] The bursa is "[a] closed fluid-filled sac that functions to provide a gliding surface to reduce friction between tissues of the body."  Definition of Bursa, MedicineNet.com, http://www.medterms.com/script/main/ art.asp?articlekey=2558 (last visited Feb. 3, 2012).

On July 6, 2001, x-rays taken of Zetino's knees at the Queens Hospital Center (the "QHC") revealed "no fracture, dislocation or other significant osseous abnormalities." (*Id.* at 141.) However, the report did note some "mild degenerative changes." (*Id.*)

On February 26, 2002, Zetino was examined by Dr. Yury Koyen. (*See id.* at 130-34.) Zetino complained of right knee pain worsened by ambulation and standing. (*Id.* at 130.) Zetino used a cane for his left side. (*Id.* at 131.) Ranges of motion in Zetino's neck, cervical spine, shoulders, elbows, wrists, thoracic spine, hips, ankles, and feet were all found to be normal. (*Id.* at 131-33.) Zetino's right knee showed "mild medial swelling [and] tenderness medially." (*Id.* at 132.) Flexion of his right knee was limited to 110 degrees (135 degrees is considered normal), and extension was to negative five degrees (zero is normal). (*Id.*) Zetino's gait was stable, and his heel, toe, and tandem walking were adequate. (*Id.* at 133.) His reflexes and muscle strength were normal. (*Id.*) Dr. Koyen diagnosed Zetino as having right knee trauma and recommended "[p]hysical therapy at a frequency of 3-4 times per week." (*Id.* at 133-34.)

On October 8, 2002, Zetino had arthroscopic surgery on his right knee. (*Id.* at 22, 842-43, 126, 148.)[9]

On March 7, 2003, Dr. Harshad Bhatt ("Dr. Bhatt") examined Zetino, who complained of pain in his right knee and right shoulder. (*See id.* at 173-74.)  Dr. Bhatt noted that Zetino was "doing well" after his right knee surgery. (*Id.* at 173.)  Dr. Bhatt observed fluid, tenderness, and swelling in Zetino's right knee, but there was no discoloration. (*Id.*)  The alignment of Zetino's knee was also good. (*Id.*)

On examination of Zetino's right shoulder, Dr. Bhatt noted that Zetino's range of motion in his shoulder joint was "restricted." (*Id.* at 174.)  Dr. Bhatt found that abduction of the shoulder was limited to 65 degrees, and flexion and extension were limited to 45 degrees bilaterally. (*Id.*)  Zetino was "severely tender over the subachromial area of [his] Right Shoulder." (*Id.*)  Rotator movement was noted as "painful" for Zetino and he tended to "keep [his] shoulder in to flexion and adduction avoiding any sudden movements." (*Id.*)  Dr. Bhatt diagnosed "Internal Derangement of right shoulder" and noted that Zetino should continue physical therapy, wear a knee brace,

---

[9] The ALJ noted that no copy of Zetino's operative report was produced or found "despite all reasonable efforts at completing the evidentiary record." (Tr. at 22.)  The ALJ, however, assumed that this surgery did in fact take place, either at the Bull Brothers Surgicenter in Queens or at the Queens Surgical Community Center. (*Id.; see also id.* at 148 (noting that Zetino had arthroscopic surgery on his right knee on October 8, 2002 at the Bull Brothers Surgicenter in Queens).)

take non-steroidal anti-inflammatory drugs ("NSAIDS"), and obtain a magnetic resonance imaging scan ("MRI") of his right shoulder.  (*Id.*)

On May 23, 2003, Dr. Bhatt examined Zetino and completed a report, stating that he had treated Zetino on a monthly basis since March 2002.  (*See id.* at 161-66.)  The report indicated that Zetino had neck and back pain, which Zetino claimed forced him to walk with a limp.  (*Id.* at 162.) Zetino's gait was antalgic[10] and slow, and he was unable to move his right shoulder.  (*Id.* at 163, 162.)  Zetino had muscle spasms in his lumbar and cervical spine.  (*Id.* at 162.)  Dr. Bhatt also noted that Zetino had herniated discs.  (*Id.*)  Zetino wore a knee brace on his right knee and used a walking cane. (*Id.*)  Dr. Bhatt diagnosed Zetino with right knee and right shoulder derangement, cervical and lumbar radiculopathy, cervical and lumbar degenerative disc disease, diabetes, and diabetic neuropathy.  (*Id.* at 161; *see also id.* at 821.)  Dr. Bhatt estimated that Zetino could stand or walk for less than two hours per day, could sit for less than six hours per day, and was limited in pushing and pulling.  (*Id.* at 163.)

---

[10] "An antalgic gait is one in which an individual experiences pain during the stance phase and thus remains on the painful leg for as short a time as possible."  (Def. Mem. at 13 (citing Taber's Cyclopedic Medical Dictionary 843 (20th ed. 2005)).)

On June 10, 2003, Dr. Edmond B. Balinberg ("Dr. Balinberg") examined Zetino. (*See id.* at 150-53.) Zetino had a brace on his right knee, held a cane in his left hand, and complained of "severe pain in the right knee." (*Id.* at 150-51.) Dr. Balinberg diagnosed Zetino with a "[h]istory of diabetes mellitus" and a "[h]istory of hypertension. (*Id.* at 151.) It was also noted that Zetino had "psoriasis with plaques over the left knee, elbows, scalp, and a few lesions over the upper and lower extremities with involvement of the body surface 10-15%." (*Id.*) Dr. Balinberg's prognosis was "[c]hronic stable condition," and it was noted that Zetino had the "[f]unctional capacity to do work related activities." (*Id.*) Dr. Balinberg "estimated that [Zetino] has some restriction in his ability to do heavy physical activities like to lift, to carry, to push and to pull heavy loads." (*Id.*)

On June 10, 2003, Dr. Kyung Seo ("Dr. Seo") performed a consultative orthopedic examination on Zetino. (*See id.* at 148-49.) Zetino complained of "pain of the right knee, limitation of range of motion of the right knee, and right leg giving way." (*Id.* at 148.) Zetino also complained of "subcutaneous crepitation of both temporomandibular joints."[11]

---

[11] "The temporomandibular joint (TMJ) is the area directly in front of the ear on either side of the head where the upper jaw (maxilla) and lower jaw (mandible) meet." Temporomandibular Joint Disorder (TMJ Disorder), MedicineNet.com, http://www.medicinenet.com/temporomandibular_joint__ disorder/article.htm (last visited Feb. 3, 2012).

(*Id.*)  Zetino's activities of daily living were noted as being "[s]omewhat limited." (*Id.*)  Throughout the exam, Zetino was "constantly using the cane"; however, Dr. Seo noted that the cane was "probably nonweightbearing." (*Id.*)  Dr. Seo also found that Zetino had a "[s]table knee joint" and "had no difficulty standing up from the sitting position and had no difficulty getting on and off the examination table." (*Id.* at 149, 148.) Zetino could heel and toe walk, although the doctor noted Zetino's complaints of right knee joint pain. (*Id.*)  Zetino could squat "approximately halfway down" and his muscle strength in both legs was graded 5/5. (*Id.* at 149.)  "Generalized psoriatic changes" were noted mainly on "both legs around the knee joint areas and low back." (*Id.*)

With regard to Zetino's back, Zetino's cervical spine and thoracolumbar spine showed normal curvature, and his "[l]umbosacral spine show[ed] mild levoscoliosis of the lumbar vertebrae," which was noted to be "functionally not significant." (*Id.*)  Dr. Seo found that Zetino had "[l]ow back derangement, probably degenerative spondylosis" and "[m]ild degenerative osteoarthritis of the right knee, probably psoriatic." (*Id.*)  Dr. Seo gave a "[g]uarded" prognosis" and noted that an x-ray of the right knee was negative. (*Id.; see also id.* at 147.)  Dr. Seo gave the following medical assessment: "Functionally, due to aching pain of the right knee

and back, sitting is slightly limited, walking is slightly limited, bending, lifting, and carrying heavy objects are slightly limited." (*Id.* at 149.)

A June 11, 2003 x-ray of Zetino's right knee requested by Dr. Balinberg revealed "no evidence of acute fracture, dislocation or destructive bony lesion." (*Id.* at 147.) A June 26, 2003 x-ray of Zetino's lumbosacral spine requested by Dr. Balinberg showed a transitional L5 vertebral body and straightening of the lumbar curvature. (*Id.* at 154.)

An x-ray of Zetino's right shoulder on August 11, 2003 was marked as "[n]ormal." (*Id.* at 557.) A MRI of Zetino's right shoulder, taken on August 25, 2003, however, suggested a "chronic tear of [the] supraspinatus tendon, with probable fibrosis and without significant retraction." (*Id.* at 220.)

In August and September 2003, Zetino attended occupational therapy for his right shoulder. (*See id.* at 271-78.) On September 16, 2003, the therapist indicated that Zetino complained of chest pain, and Zetino was referred to a cardiac clinic. (*See id.* at 223-24.) On October 30, 2003, he was discharged from therapy after missing occupational therapy appointments for one month. (*Id.* at 274.)

At an October 9, 2003 examination at the QHC, Zetino complained of low back pain and "stiffness in knees after sitting in car for 2 hours when he goes to Atlantic City." (*Id.*

14

at 222.)  The report from this examination indicated that Zetino had degenerative joint disease and osteoarthritis.  (*Id.*)

Dr. Bhatt examined Zetino again on October 31, 2003. (*See id.* at 182-84.)  Dr. Bhatt noted that Zetino had "so much pain in the right knee that he [was] unable to walk and he limp[ed] heavily."  (*Id.* at 182.)  Zetino complained of "severe pain in the neck and lower back with radiation to the upper and lower extremities."  (*Id.*)  Zetino also told the doctor that he was unable to sleep and had "tingling and numbness in the area of the hand in all the fingers."  (*Id.*)  Dr. Bhatt noted that "[a]ll the movements and walking causes aggravation of the pain in the back and legs."  (*Id.*)  Zetino's gait was "[a]ntalgic without support," but his sensory and motor functions were normal.  (*Id.*)  Notably, Dr. Bhatt indicated that Zetino had "no previous problem with the knee" and that Zetino "does not drink."  (*Id.*)  Zetino had normal heart sounds and no murmurs; his skin was also clear.  (*Id.* at 183.)  Dr. Bhatt found that Zetino had "severe restriction of motion" in his right shoulder and "severe pain on abduction and internal rotation."  (*Id.*) Dr. Bhatt diagnosed "[l]umbar radiculopathy," "[i]nternal derangement of shoulder," "[r]ight shoulder traumatic bursitis and tenosynovitis," "[h]erniated disc cervical spine," and "[i]nternal derangement of knee."  (*Id.* at 184.)  Dr. Bhatt

15

recommended treatment with NSAIDs, muscle relaxants, and physical therapy. (*Id.*)

In a May 9, 2005 medical assessment of Zetino's ability to do work-related activities, Dr. Bhatt stated that due to Zetino's shoulder derangement and diabetes, he could lift and/or carry 10 to 15 pounds for up to one-third of an eight-hour work day. (*Id.* at 185.) Due to his diabetes with neurological deficits and peripheral neuritis, Zetino could stand and/or walk for a total of only two hours out of an eight-hour work day. (*Id.*) Due to his knee derangement, he could sit for a total of two hours out of an eight-hour work day, and he could not climb, stoop, kneel, balance, crouch, or crawl. (*Id.*) Dr. Bhatt noted that Zetino's reaching, handling, feeling, pushing, and pulling were limited by his diabetes with peripheral neuropathy. (*Id.* at 186.) Further, Dr. Bhatt indicated that Zetino had environmental restrictions with regard to height, moving machinery, temperature extremes, humidity, and vibration. (*Id.*)

**B. Zetino's Non-Orthopedic Impairments**

The record also contains the following medical evidence regarding Zetino's additional impairments, including diabetes, hepatitis, hypertension, psoriasis, gastritis,

esophageal varices,[12] and liver disease.  On July 5, 2001, Zetino
went to the QHC emergency room, complaining of left-sided chest
pain after drinking alcohol.  (*Id.* at 296A-98, 318, 327, 344-
45.)  Zetino was then admitted to the hospital.  (*Id.* at 327.)
A chest x-ray showed no focal consolidation or significant
effusions, but the impression was limited due to poor
inspiratory effort.  (*Id.* at 146.)  A discharge order dated July
9, 2001 stated that once he was admitted, Zetino's chest pain
subsided.  (*Id.* at 296A, 327.)  The principal diagnosis upon
discharge was alcohol withdrawal delirium, and the secondary
diagnoses were acute alcoholic intoxication, chest pain,
undiagnosed cardiac murmurs, psoriasis, disorder of magnesium
metabolism, alcohol gastritis,[13] and pain in lower leg joint.
(*Id.* at 337.)

On August 10, 2001, an esophagogastroduodenoscopy was
performed on Zetino at the QHC gastrointestinal clinic.  (*Id.* at
304.)  The results showed esophageal varices, evidence of mild
reflux with esophagitis, gastric varices, portal gastropathy,
and diffuse gastritis of the entire stomach.  (*Id.*)  The
duodenum was within normal limits, however, and there was no

---

[12] Esophageal varices are "abnormal, enlarged veins in the lower part of the
esophagus — the tube that connects the throat and stomach."  Esophageal
varices, MayoClinic.com, http://www.mayoclinic.com/health/esophageal-
varices/DS00820 (last visited Feb. 3, 2012).

[13] Gastritis is the inflammation of the stomach lining.  Gastritis,
MedicineNet.com, http://www.medicinenet.com/gastritis/article.htm (last
visited Feb. 3, 2012).

peptic ulcer disease or masses.  (*Id.*)  Zetino was told to follow up with the gastrointestinal clinic for what appeared to be cirrhosis,[14] and he was encouraged to stop alcohol intake. (*Id.*)  Notes dated August 27, 2001 from the QHC gastrointestinal clinic indicate that Zetino had portal hypertension secondary to alcohol abuse, but he may not yet have had cirrhosis.  (*Id.* at 264.)

On April 22, 2002, Zetino was examined at the QHC and found to have "no pain."  (*Id.* at 210.)  On May 31, 2002, Zetino was diagnosed with latent syphilis, hyperlipidemia,[15] esophagus varices without bleeding, chronic hepatitis C without coma, and acute alcoholic hepatitis.  (*Id.* at 491.)  On July 9, 2002, the QHC dermatology clinic diagnosed Zetino with psoriasis.  (*Id.* at 244, 498.)  On August 26, 2002, the QHC gastrointestinal clinic diagnosed Zetino with unspecified alcoholic liver damage and noted that Zetino claimed to have been sober for three months. (*Id.* at 495, 261.)  On October 1, 2002, Zetino was diagnosed with latent syphilis, hyperlipidemia, esophageal varices without bleeding, chronic hepatitis C without coma, and psoriasis.  (*Id.* at 494.)  On October 24, 2002, an ultrasound revealed that

---

[14] Cirrhosis is "a complication of many liver diseases that is characterized by abnormal structure and function of the liver."  Cirrhosis (Cirrhosis of the Liver), MedicineNet.com, http://www.medicinenet.com/cirrhosis/article.htm (last visited Feb. 3, 2012).

[15] Hyperlipidemia refers to "[h]igh lipid (fat) levels in the blood." Definition of Hyperlipidemia, MedicineNet.com, http://www.medterms.com/ script/main/art.asp?articlekey=3838 (last visited Feb. 3, 2012).

Zetino's liver was enlarged, but that the biliary ducts and common bile duct were not dilated. (*Id.* at 503.) On January 10, 2003, Zetino was examined at the QHC and diagnosed with alcohol hepatitis C, questionable cirrhosis, hypothyroidism,[16] esophageal varices, latent syphilis, hyperlipidemia, hyperglycemia,[17] psoriasis, and periodontitis.[18] (*Id.* at 137.) Zetino was also found to have new onset diabetes. (*Id.*) The next day, Zetino was seen at the QHC emergency room with a blood sugar level of 490, complaining of weakness and polydypsia. (*Id.* at 219.) On January 14, 2003, Zetino was seen by the QHC diabetes clinic, where he was prescribed insulin for his diabetes. (*Id.* at 251.) A February 14, 2003 abdominal CT scan showed slight additional hypertrophy of Zetino's left lobe of the liver, suggesting cirrhosis, but his spleen was not enlarged. (*Id.* at 391.)

At a regular check up on March 17, 2003, Zetino complained of chest pain "on and off" for three days, but he had no shortness of breath or cough. (*Id.* at 389-90, 354.) He had abnormal erythematous skin lesions on his lower extremities and

---

[16] Hypothyroidism is "a condition characterized by abnormally low thyroid hormone production." Hypothyroidism, MedicineNet.com, http://www.medicinenet.com/hypothyroidism/article.htm (last visited Feb. 3, 2012).

[17] Hyperglycemia refers to high blood sugar. Definition of Hyperglycemia, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=3836 (last visited Feb. 3, 2012).

[18] Periodontitis refers to gum disease. Definition of Periodontitis, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=4837 (last visited Feb. 3, 2012).

abdomen, and his liver was abnormally enlarged.  (*Id.* at 385.)
On May 12, 2003, the QHC diagnosed Zetino as having
hyperlipidemia and uncontrolled type II diabetes without
complications.  (*Id.* at 597.)

On August 11, 2003, Zetino underwent a physical
examination at the QHC after complaining of heaviness and
numbness on his right side, especially in the morning.  (*Id.* at
549.)  He was found to have psoriasis and "[a]bnormal pain while
abducting the [right] shoulder," but he did not have chest pain
or headaches.  (*Id.* at 550, 552.)  Zetino was diagnosed with
hypothyroidism and diabetes, which were both marked as "well
controlled," hyperlipidemia, unspecified alcoholic liver damage,
esophageal varices without bleeding, psoriasis, hepatitis C, and
right shoulder pain.  (*Id.* at 551, 553.)

A November 18, 2003 examination found that Zetino's
cholesterol and psoriasis were controlled.  (*Id.* at 584.)  His
esophageal varices were "not apparently [an] active prob[lem],"
and his liver function tests were "mostly normal."  (*Id.*)
Zetino displayed "no current [symptoms]" of hypothyroidism, and
there were no "apparent" signs of his hepatitis C.  (*Id.*)

A February 24, 2004 physical examination found that
Zetino's chest, lungs, heart, arms, and legs were normal and his
hepatitis C and liver function tests were "OK."  (*Id.* at 516.)
Zetino was diagnosed with hypothyroidism, uncontrolled diabetes

without complications, and hyperlipidemia.  (*Id.* at 518.)  On March 19, 2004, aside from Zetino's GGT liver function test, all other tests were normal.  (*See id.* at 522.)  Notes from the QHC dated April 21, 2004 indicate that Zetino's liver function tests were abnormal, although Zetino stated that he had been sober for several years.  (*Id.* at 258.)  On April 28, 2004, Zetino was seen at the QHC cardiac clinic and had "no complaints," but he revealed that he "gets chest tightness during intercourse or when he is doing strenuous work."  (*Id.* at 230.)  A May 17, 2004 abdominal ultrasound report noted that Zetino's liver was "suspicious for liver parenchymal disease."[19]  (*Id.* at 526.)

On May 20, 2004, Zetino underwent a left heart catheterization.  (*Id.* at 231.)  His arteries and coronaries were found to be normal, he had normal left ventrical (LV) systolic function, and there was no mitral regurgitation[20] or aortic stenosis[21].  (*Id.*)

---

[19] Parenchyma is defined as "[t]he key elements of an organ essential to its functioning, as distinct from the capsule that encompasses it and other supporting structures."  Definition of Parenchyma, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=12708 (last visited Feb. 3, 2012).

[20] Mitral regurgitation is "[b]ackflow of blood from the left ventricle to the left atrium of the heart due to mitral insufficiency from incomplete closure of the mitral valve."  Definition of Mitral Regurgitation, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=4409 (last visited Feb. 3, 2012).

[21] Aortic stenosis is the "abnormal narrowing of the aortic valve."  Aortic Valve Stenosis, MedicineNet.com, http://www.medicinenet.com/ aortic_stenosis/article.htm (last visited Feb. 3, 2012).

On May 25, 2004, Dr. Garima Gupta of the QHC examined Zetino. (*See id.* at 367-68.) Dr. Gupta found "[a]bnormal psoriatic rashes in legs, bach [sic], abdomen, [and] upper ext[remities]." (*Id.* at 367.) Zetino's back, spine, chest, lungs, and heart were normal. (*Id.*) Dr. Gupta diagnosed Zetino with hypertension controlled with medication, uncontrolled diabetes mellitus,[22] "hyperlipidemia [controlled] with lipitor," psoriasis, and peripheral neuropathy with minimal pain. (*Id.* at 368.) Dr. Gupta further noted that Zetino's hepatitis C viral load was "very low." (*Id.*) On May 26, 2004, Zetino was seen at the QHC and his diabetes, though uncontrolled, was found to have produced no complications. (*Id.* at 373.)

On June 22, 2004, Zetino was seen at the QHC dermatology clinic for psoriasis and told to return in six months. (*Id.* at 369.) On June 23, 2004, Zetino reported to the QHC that he felt "okay." (*Id.* at 257.) It was determined that his hepatitis C was undetectable in an April 21 blood test, and he was told to return in one year for another sonogram. (*Id.* at 257.) Liver function tests performed on June 4 and July 27, 2004 were normal, except for elevated GGT. (*Id.* at 370, 372.) Tests performed on October 29, 2004 liver showed elevated Alk. Phos, GGT, cholesterol, triglyeride, and glucose levels. (*Id.*

---

[22] Zetino's diabetes mellitus had been recently treated by "increased insulin via endocrine in [M]ay '04" and was marked "[controlled] with present regimen." (Tr. at 368.)

at 396-98.)  On November 9, 2004, Zetino's sugars were out of control and his cholesterol was very high.  (*Id.* at 402.)

On November 26, 2004, reports from the QHC stated that Zetino's diabetes was still uncontrolled and that Zetino had not been taking his hypothyroidism medication for over a year.  (*Id.* at 410.)  Zetino's hepatitis C was noted to exhibit a "low viral load."  (*Id.*)  Zetino reported that he had "no pain," and in describing his activities of daily living, the medical report stated that Zetino was "independent."  (*Id.* at 411.)

During an April 22, 2005 examination at the QHC, Zetino was diagnosed with acute bronchitis, although his chest and lungs were clear.  (*Id.* at 420, 427-28.)  Zetino complained of chest pain and an electrocardiogram showed changes suggesting pericarditis, but there were no clinical signs, and his cardiac examination was marked "regular."  (*Id.* at 427-28.)  He was referred for an echocardiogram.  (*Id.* at 428.)  On April 26, 2005, Zetino exhibited high blood sugar and high cholesterol levels.  (*Id.* at 430.)  The medical report noted that Zetino had been away for two months and took no medication during that time.  (*Id.*)  He had no abnormal rashes or skin infections, no chest pain or dyspnea on exertion, and no burning or tingling in his feet.  (*Id.*)  He was diagnosed with hypothyroidism, hyperlipidemia, and uncontrolled Type II diabetes.  (*Id.* at 432.)  A June 22, 2005 echocardiogram showed normal mitral,

aortic, tricuspid, and pulmonic valves. (*Id.* at 437.) There was borderline left ventricular hypertrophy, but no pericardial effusion. (*Id.*) On June 23, 2005, Zetino was seen by the QHC cardiac unit complaining of recurrent chest pain. (*Id.* at 205). Zetino reported that he could walk for one-half hour and up to ten blocks. (*Id.*)

When seen at the QHC on July 19, 2005, Zetino's blood sugar was fluctuating, and it was noted that he had "difficulty walking due to leg pain." (*Id.* at 441, 481.) Examinations of Zetino's chest, lungs, heart, arms, and legs were normal. (*Id.* at 442.) His deep tendon reflexes were intact, and sensation in his feet was intact to touch. (*Id.*) On August 16, 2005, the QHC noted that Zetino's diabetes was "poorly controlled due to diet." (*Id.* at 457.) Zetino's hypertension was "well controlled," but it was noted that not much could be done with respect to his hyperlipid because his diet was so poor. (*Id.*) An examination of Zetino's chest, lungs, heart, arms, and legs was normal. (*Id.*) His deep tendon reflexes were intact and sensation in his feet was intact to touch. (*Id.*)

On June 27, 2006, six months after the date last insured, Zetino was brought to Mary Immaculate Hospital when he was unresponsive after drinking alcohol all day. (*See id.* at 785-87.) Zetino's blood alcohol level was 432 mg/dl. (*Id.* at 690.) The record notes that blood alcohol levels above 400 are

24

fatal.  (*See id.*)  Zetino had difficulty breathing and was intubated.  (*Id.* at 786.)  Zetino was "admitted to the ICU secondary to alcohol intoxication and status post respiratory failure on intubation, on the ventilation, and hepatic encephalopathy."[23]  (*Id.*)  Zetino's vitals were "unstable" and his blood pressure was "very low."  (*Id.*)  He was bleeding internally, and his condition was "deteriorating."  (*Id.*)  Zetino died on June 29, 2006.  (*Id.* at 81, 785.)

## IV.  Summary of Workers' Compensation Forms

Dr. Gray completed New York State Workers' Compensation forms based upon examinations conducted on October 6, October 13, and December 12, 2000, and February 8, March 9, and May 17, 2001.[24]  (*See id.* at 188-92.)  Dr. Gray indicated that Zetino was totally disabled from regular duties or work due to cartilage damage in his right knee.  (*See id.*)

Dr. Bhatt also completed Workers' Compensation forms based upon examinations conducted from March 2002 through July 2005.  (*See id.* at 627-59.)[25]  Dr. Bhatt indicated on Workers'

---

[23] Encephalopathy refers to "brain disease, damage, or malfunction." Encephalopathy, MedicineNet.com, http://www.medicinenet.com/encephalopathy/article.htm (last visited Feb. 3, 2012).

[24] In compliance with the Appeals Council's order, (*see* Tr. at 85-88), the ALJ issued a subpoena for Dr. Gray's medical treatment records.  (*See id.* at 660-69; *see also id.* at 21, 28.)  The subpoena, however, was returned without response.  (*Id.* at 21.)

[25] The ALJ issued a subpoena requesting additional medical records from Dr. Bhatt, but only the Workers' Compensation forms were submitted.  (*See* Tr. at 626; Def. Mem. at 24.)

Compensation forms dated December 5, 2003,[26] and May 3, August
13, September 17, October 15, and November 15, 2004 that Zetino
was totally disabled from regular duties or work. (*See id.* at
187, 649-53). Prior to December 5, 2003, as well as on December
17, 2004, however, Dr. Bhatt did not specify whether Zetino's
purported disability was total or partial. (*See id.* at 627-48,
654.) Moreover, on Workers' Compensation forms dated February
18, March 18, April 18, June 17, and July 22, 2005, Dr. Bhatt
indicated that Zetino was only partially disabled. (*See id.* at
655-59.)[27]

## IV. **Summary of the Medical Experts' Testimony**

Dr. Donald Goldman testified as a medical expert at
the February 21, 2006 ALJ hearing. (*See id.* at 865-80.) Dr.
Goldman explained that, "as a result of [Zetino's] shoulder and
knee problems, there is an additional issue complicating
[Zetino's] ability to function and that being a long history of
significant medical problems, some of which prevented him from
undergoing additional treatment." (*Id.* at 869.) Specifically,
Dr. Goldman pointed to Zetino's diabetes, hepatitis C, bleeding
with a history of gastritis and esophageal varices, and "some

---

[26] The record also contains a duplicate, but unsigned, copy of the December 5, 2003 Workers' Compensation Form in which the box indicating total disability is not checked. (*See* Tr. at 644.)

[27] With the exception of his December 5, 2003 Workers' Compensation form, (*see* Tr. at 187), Dr. Bhatt did not indicate whether Zetino was disabled between March 2002 and May 2004. (*See id.* at 627-48.)

other medical conditions that compromise stamina and endurance." (*Id.*)  Dr. Goldman further noted that "decompensation of the heart was a concern."  (*Id.*)  Dr. Goldman concluded that, "between his shoulder problem, his knee problem, and his medical problems, [Zetino] is not able to, in my opinion, work."  (*Id.*)

With respect to Zetino's knee injury, Dr. Goldman stated that he "[did] not see a clear understanding as far as ranges of motion in the records."  (*Id.* at 870-71.)  Nor did he see any range of motion findings for Zetino's shoulder.  (*Id.* at 871.)  Nevertheless, Dr. Goldman found that according to the shoulder MRI, Zetino suffered from "a deduction in shoulder motion at shoulder level or above."  (*Id.* at 874.)  According to Dr. Goldman, "[e]xternal rotation [of Zetino's shoulder] would be restricted, anterior elevation may be restricted, [but] internal rotation was probably not restricted."  (*Id.*)

Dr. Goldman testified that he agreed with Dr. Bhatt's May 23, 2003 assessment of Zetino's limitations and that Zetino would be unable to work.  (*Id.* at 876-77; *see also id.* at 161-66.)  Dr. Goldman testified that Zetino could only walk a block or two and could not negotiate steps, kneel, squat, or bend.  (*Id.* at 877.)  Zetino also had "significant restriction on his right arm and shoulder" and could not carry, lift his arm above shoulder level, or reach behind him.  (*Id.* at 877-78.)  Further, Dr. Goldman stated that "even sitting would be compromised due

to [Zetino's] knee," because sitting for more than thirty minutes would cause his knee to become stiff, and he would have to shift his weight and shift the position of his knee while sitting. (*Id.* at 878.)

Dr. Louis Lombardi testified as a medical expert at the August 5, 2008 ALJ hearing. (*See id.* at 806-26.) Dr. Lombardi stated that Zetino had a "long history of alcohol abuse and injury to his right shoulder and right knee." (*Id.* at 807.) He then reviewed the medical evidence in the record, including the reports by Drs. Bhatt, Seo, Koyen, and Ballinberg. (*Id.* at 807-11.) Dr. Lombardi observed that Zetino had "some restriction of motion of the right knee," specifically that flexion was to 110 degrees and extension was to minus five degrees. (*Id.* at 810.) While Zetino's flexion and extension did represent a "numerical decrease," according to Dr. Lombardi, this limited range of motion was not functionally limiting. (*Id.*)

## V.  Summary of the Vocational Expert's Testimony

Mr. Andrew Pasternak, a vocational expert ("Mr. Pasternak"), testified at the August 5, 2008 hearing. (*See id.* at 827-36.)  Mr. Pasternak testified that Zetino previously worked as a "painter of transportation equipment" and that such work is considered a "skilled job." (*Id.* at 829.)  Mr. Pasternak stated that Zetino's former job is generally

considered medium exertional work, but, as Zetino performed it, it was heavy work.  (*Id.* at 829, 830, 833).  According to Mr. Pasternak, Zetino had skills such as driving, inspecting, measuring, painting, and using hand and power tools.  (*Id.* at 831.)  Mr. Pasternak indicated that Zetino's driving skills would be transferable to jobs such as truck driving, which would be medium level work, or limo driving, which would be light level work.  (*Id.*)  Mr. Pasternak also testified that Zetino's painting skills could be transferable to a number of light level jobs.  (*Id.* at 831-32.)  These jobs totaled "about 2,000 in the local economy and over 34,000 in the national economy."  (*Id.* at 832.)  Mr. Pasternak further testified that "someone who had limited ability in English would still be able to do the types of painting jobs [alluded to by Mr. Pasternak] because [these jobs] would be industrially-based, and [an individual] should be able to find work doing that type of work."  (*Id.* at 833)  Mr. Pasternak also stated that "truck driving would not be precluded by someone who's Spanish speaking at all within this geographic area."  (*Id.*)

In response to a hypothetical posed by defense counsel, Mr. Pasternak stated that an individual who could not fully use his dominant hand or lift more than five pounds could not find work.  (*Id.* at 833-34.)  Further, assuming that an individual had an eighth grade education, could not speak

English fluently, and had the residual functional capacity to
sit for less than two hours in an eight-hour day, to stand for
less than two hours in an eight-hour day, and to lift five
pounds with a limitation in his ability to reach and handle, Mr.
Pasternak testified that the individual could not perform any
jobs in the national economy. (*Id.* at 834-35.)

**VI.   The ALJ's September 12, 2008 Opinion**

On September 12, 2008, the ALJ issued an opinion
finding that Zetino was not disabled under the Act. (*See id.* at
13-32.)  Performing the five-step analysis set forth in the
Social Security Administration Regulations (the "Regulations")
at 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ first
found that Zetino "did not engage in substantial gainful
activity after October 2, 2000," and, second, found that Zetino
had "severe impairments" consisting of "right knee derangement,
osteoarthritis of the right knee, right shoulder derangement,
psoriasis, liver disease, hepatitis, diabetes mellitus,
hypertension, gastritis, esophageal varices and history of
alcoholism." (*Id.* at 20.)  Third, the ALJ determined that
Zetino "did not have an impairment or combination of impairments
that met or medically equaled one of the listed impairments in
20 C.F.R. Part 404, Subpart P, Appendix 1." (*Id.*)

Fourth, the ALJ concluded that Zetino "had the

residual functional capacity to perform the full range of light work as defined in" 20 C.F.R. §§ 404.1567(b) and 416.967(b). (*Id.*)  In making this determination, the ALJ found Zetino's subjective "allegations and complaints" to be "disproportionate to the record," and "lack[ing] support in the medical record." (*Id.* at 27.)

Considering Zetino's medical impairments, the ALJ determined that "there is no evidence that [Zetino's diabetes] caused any disabling effects such as end organ damage, vision loss, or neuropathy." (*Id.*)  The ALJ also found that Zetino's hypertension was "under control," his blood pressure was "within normal limits," and "there was no evidence of any end organ damage." (*Id.* at 28.)  Next, the ALJ determined that, "[w]ith respect to hepatitis, [Zetino's] liver function levels were elevated, but his viral load was undetectable on serum testing." (*Id.*)  Further, according to the ALJ, there was "no evidence of liver failure prior to [Zetino's] hospitalization in June 2006." (*Id.*)

The ALJ found that, while Zetino complained of chest pains, "[electrocardiogram] testing and catheterization determined that there was no underlying ischemic heart disease and no blockage of the cardiac vessels." (*Id.*)  In addition, Zetino's heart had "normal rate and rhythm . . . [and] [n]o edema was found in the extremities." (*Id.*)

31

As for Zetino's orthopedic impairments, the ALJ determined that while Zetino did have "some limited range of motion in" his knee and shoulder joints, he underwent physical therapy as opposed to surgery on his shoulder. (*Id.*)  The ALJ also found that other than Zetino's October 2002 right knee surgery, his medical treatment was "conservative." (*Id.*) Zetino's pain relievers were NSAIDS, and his "medications were not unusual for either type or dosage, and there was no indication that they produced any adverse side effects." (*Id.*) The ALJ also considered Zetino's daily living activities, noting that Zetino "was independent in self care" and was able to travel to Guatemala in 2004. (*Id.*)

Turning to the medical experts' opinions, the ALJ determined that the opinions of Zetino's treating physicians, Drs. Gray and Bhatt, were not entitled to "controlling, or even great, weight." (*Id.* at 30).  The ALJ noted that Dr. Gray's opinion was rendered in the context of Zetino's application for Workers' Compensation benefits, for which the standard "differs substantially from the Social Security Disability program." (*Id.* at 28.)  The ALJ further noted that "Dr. Gray provided no evidence in support of his opinion." (*Id.*)  Additionally, the ALJ found Dr. Gray's conclusion of total disability to be contradicted by the reports of Drs. Koyen and Seo. (*See id.* at 28-29.)

32

In considering Dr. Bhatt's conclusions, the ALJ noted that Dr. Bhatt's opinion was based, in part, on his diagnosis of cervical and lumbar radiculopathy and diabetic neuropathy, two diagnoses that the ALJ found were unsupported by the medical evidence in the record. (*Id.* at 29.)  The ALJ also found that Dr. Bhatt's conclusion was contradicted by the reports of Drs. Seo and Balinberg. (*Id.*)  Additionally, the ALJ noted that the reports from the QHC, as well as Zetino's "prescribed treatment," were inconsistent with Dr. Gray's and Dr. Bhatt's opinions. (*Id.*)  Finally, the ALJ stated that Zetino did not use a cane at his hearing and took "an extended trip to his native Guatemala." (*Id.*)  Thus, the ALJ did not give controlling, or even great, weight to the opinions of Drs. Bhatt and Gray. (*See id.* at 30.)

The ALJ also rejected, and gave no weight to, the testimony of Dr. Goldman. (*Id.*)  The ALJ found that "Dr. Goldman's testimony was broad, general and lacked specificity" and that it was not consistent with the findings from the QHC. (*Id.*)

Based on the evidence in the record, the ALJ then determined that Zetino:

> retained the ability to walk and/or stand 6 hours in an 8-hour day with change in position during regularly scheduled breaks, sit 6 hours in an 8-hour day with change in position during regularly scheduled breaks,

33

> occasionally lift and/or carry twenty
> pounds, frequently lift and/or carry ten
> pounds, push and/or pull up to twenty
> pounds, grasp and manipulate and use his
> hands and perform physical activity that
> permitted light work.

(*Id.*)  The ALJ concluded that Zetino had the residual functional capacity ("RFC") to perform light work, a conclusion that, according to the ALJ, was "supported by findings from Queens Hospital Center, findings of Dr. Yury Koyen and the impartial consultants, the assessments of the impartial consultants and the claimant's activities." (*Id.*)

Having determined Zetino's RFC, the ALJ found, at step four in the disability analysis, that Zetino "was unable to perform any past relevant work." (*Id.*)  Turning to step five, the ALJ concluded that Zetino was a "younger individual age 18-49" and "had a limited education and was able to communicate in English." (*Id.* at 31.)  The ALJ determined that Zetino had some transferable skills, but stated that "[t]ransferability of job skills [was] not material to the determination of disability" in this case. (*Id.*)  "Considering [Zetino's] age, education, work experience, and residual functional capacity," the ALJ applied Rule 202.18 of the Medical Vocational Rules, which directs a finding of "not disabled."[28] (*Id.*)  *See* 20 C.F.R. Part 404,

---

[28] Rule 202.18 applies where the claimant is a "younger individual," has no more than a "limited" education, is "skilled or semiskilled" but has no transferable skills, and can perform "light work." *See* 20 C.F.R. Part 404, Subpart P, app. 2, R. 202.18.

Subpart P, app. 2, R. 202.18.   Thus, the ALJ concluded that

"there were jobs that exist in significant numbers in the

national economy that [Zetino] could have performed during the

relevant period," so Zetino "was not under a disability, as

defined in the Social Security Act, from October 2, 2000 through

the date of his death."   (Tr. at 31, 32.)

<u>DISCUSSION</u>

**I.   Standard of Review**

    **A.   Legal Standards Governing the Commissioner's Determination of Eligibility to Receive Benefits**

        **1.   The Commissioner's Five-Step Analysis for Determining Whether a Claimant is Disabled Under the Act**

Under the Act, "[e]very aged, blind, or disabled

individual who is determined . . . to be eligible on the basis

of his income and resources shall, in accordance with and

subject to the provisions of this subchapter, be paid benefits

by the Commissioner of Social Security."   42 U.S.C. § 1381a.   A

claimant is considered disabled under the Act if he is unable

"to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12

months."   <i>Id.</i> § 423(d)(1)(A).   The impairment must be of "such

severity that [the claimant] is not only unable to do his

previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

In evaluating whether a claimant is disabled, the SSA requires the ALJ to conduct a five-step sequential analysis finding each of the following: (1) that the claimant is not working; (2) that the claimant has a medically determinable impairment or a combination of impairments that is "severe"; (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability; (4) that the claimant is not capable of continuing in his prior type of work; and (5) there is no other type of work that the claimant can do. *Burgess v. Astrue,* 537 F.3d 117, 120 (2d Cir. 2008); *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c).

At steps one through four of the five-step evaluation process, the claimant bears the general burden of proving disability. *Burgess,* 537 F.3d at 128. At step five, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's residual functional capacity, age, education, and work experience, he is

36

"able to engage in gainful employment within the national economy." *Sobolewski v. Apfel,* 985 F. Supp. 300, 310 (E.D.N.Y. 1997). "[T]he Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam); *see also* 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

During this five-step analysis, the Commissioner must "'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity' to establish eligibility for Social Security benefits." *Burgin v. Astrue,* 348 F. App'x 646, 647 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1523). In cases where "the disability claim is premised upon one or more listed impairments . . . the [Commissioner] should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry v. Schweiker,* 675 F.2d 464, 469 (2d Cir. 1982). Additionally, "ALJs, unlike judges, have a duty to 'affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings.'" *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584, at *7 (E.D.N.Y. Aug. 28, 2009) (quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)); *see also* 20 C.F.R.

37

§ 702.338 ("The administrative law judge shall inquire fully
into the matters at issue and shall receive in evidence the
testimony of witnesses and any documents which are relevant and
material to such matters.").

### 2.   Determining a Claimant's Residual Functional Capacity ("RFC")

Between steps three and four in the aforementioned
five-step analysis, the Commissioner is required to assess a
claimant's RFC.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  A
claimant's RFC is "the most [a claimant] can still do despite
[his] limitations," and the Commissioner assesses RFC "based on
all the relevant evidence in [the claimant's] case record."  *Id.*
§§ 404.1545(a)(1), 416.945(a)(1).  In determining a claimant's
RFC, "[t]he nature of the limitations is not the focus — the
focus is on what work, if any, a claimant can perform after
taking into account his limitations."  *McEachin v. Astrue*, No.
08-CV-0013, 2010 WL 626820, at *10 (E.D.N.Y. Feb. 23, 2010).

The Commissioner "will assess [a claimant's] residual
functional capacity based on all of the relevant medical and
other evidence" and "will consider any statements about what
[the claimant] can still do that have been provided by medical
sources, whether or not they are based on formal medical
examinations."  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  The
Commissioner "will also consider descriptions and observations

38

of [the claimant's] limitations from [his] impairment(s),

including limitations that result from [his] symptoms, such as

pain, provided by [the claimant], [the claimant's] family,

neighbors, friends, or other persons." *Id.*

In assessing a claimant's RFC, the ALJ is required to

provide:

> a narrative discussion describing how the
> evidence supports each conclusion, citing
> specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g.,
> daily activities, observations). In
> assessing RFC, the adjudicator must discuss
> the individual's ability to perform
> sustained work activities in an ordinary
> work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a
> week, or an equivalent work schedule), and
> describe the maximum amount of each work-
> related activity the individual can perform
> based on the evidence available in the case
> record. The adjudicator must also explain
> how any material inconsistencies or
> ambiguities in the evidence in the case
> record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) (footnote

omitted).[29]  The RFC assessment must also include "a discussion

of why reported symptom-related functional limitations and

restrictions can or cannot reasonably be accepted as consistent

with the medical and other evidence.  In instances in which the

adjudicator has observed the individual, he or she is not free

---

[29] "Social Security rulings are binding." *Robins v. Astrue*, No. CV-10-3281,
2011 WL 2446371, at *4 (E.D.N.Y. June 15, 2011).

to accept or reject that individual's complaints *solely* on the basis of such personal observations." *Id.*

Once a claimant's RFC has been determined, that RFC will be used in step four of the disability analysis to determine whether the claimant can perform his past relevant work, *see* 20 C.F.R. §§ 404.1545(a)(5)(i), 416.945(a)(5)(i), and, if not, at step five, to determine whether the claimant "can make an adjustment to any other work that exists in the national economy," *id.* §§ 404.1545(a)(5)(ii), 416.945(a)(5)(ii).  To determine the physical exertion requirements of work in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  *See id.* §§ 404.1567, 416.967.

### 3.   Weight to be Afforded to Medical Evidence and the Treating Physician Rule

"Regardless of its source," the ALJ must evaluate "every medical opinion" in determining whether a claimant is disabled under the Act.  *Id.* §§ 404.1527(d), 416.927(d).  Where "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight."  *Id.* §§ 404.1527(d)(2), 416.927(d)(2).  Medically acceptable clinical and laboratory diagnostic

techniques may include "[a] patient's report of complaints, or history." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (alteration in original) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).

Pursuant to the Regulations, a treating source is "your own physician . . . or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. §§ 404.1502, 416.902.  The Regulations also provide that the medical opinion of a treating physician "on the issue(s) of the nature and severity of [the] impairment" will be given controlling weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (the treating physician rule "requires deference to the medical opinion of a claimant's treating physician."); *Burgess*, 537 F.3d at 128 (citing *Green-Younger*, 335 F.3d at 106); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010)).  The opinions of treating physicians are given controlling weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s)

and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527, 416.927.

On the other hand, in situations where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts," the treating physician's opinion "is not afforded controlling weight." *Halloran*, 362 F.3d at 32; *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling."). Additionally, findings that "a claimant is disabled and cannot work are reserved to the Commissioner," and a treating physician's opinion on these points is not afforded controlling weight. *Snell*, 177 F.3d at 133 (internal citations omitted); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Thus, the ALJ "considers the data that physicians provide but draws [his or her] own conclusions as to whether those data indicate disability." *Snell*, 177 F.3d at 133. Nonetheless, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Scott v. Astrue*, No. 09-CV-3999, 2010 WL 2736879, at *9 (E.D.N.Y. July 9, 2010) (citing *Rosa v.*

*Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.").

When controlling weight is not given to a treating physician's opinion, the Regulations require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33; *see also Snell*, 177 F.3d at 133; *Jeffcoat v. Astrue*, No. 09-CV-5276, 2010 WL 3154344, at *14 (E.D.N.Y. Aug. 6, 2010); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (the SSA "will *always give good reasons* in [its] notice of determination or decision for the weight [given to a] treating source's opinion") (emphasis added).  Courts have not "hesitate[d] to remand [cases] when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion." *Halloran*, 362 F.3d at 33.  Additionally, the court should "continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Id.*

The Regulations set forth the following factors that ALJs must apply to determine how much weight should be given to a treating physician's opinion:

>(i) the frequency of examination and the
>length, nature and extent of the treatment
>relationship; (ii) the evidence in support
>of the treating physician's opinion; (iii)
>the consistency of the opinion with the
>record as a whole; (iv) whether the opinion
>is from a specialist; and (v) other factors
>brought to the Social Security
>Administration's attention that tend to
>support or contradict the opinion.

*Halloran,* 362 F.3d at 32; *see also Scott*, 2010 WL 2736879, at

*17; 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

>B.   **The Substantial Evidence Standard**

A district court reviews the Commissioner's decision

to "determine whether the correct legal standards were applied

and whether substantial evidence supports the decision." *Butts*

*v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004) (citing *Machadio*

*v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)).  "Substantial

evidence is 'more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  *Halloran*, 362 F.3d at 31 (quoting

*Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

After reviewing the Commissioner's determination, the

district court may "enter, upon the pleadings and transcript of

the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security, with or without

remanding the cause for a rehearing." *Butts*, 388 F.3d at 384

(quoting 42 U.S.C. § 405(g)).  "Remand is 'appropriate where,

due to inconsistencies in the medical evidence and/or
significant gaps in the record, further findings would . . .
plainly help to assure the proper disposition of [a] claim.'"
*Lackner v. Astrue*, No. 09–CV–895, 2011 WL 2470496, at *7
(N.D.N.Y. May 26, 2011) (quoting *Kirkland v. Astrue*, No. 06–CV–
4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008)).

"The findings of the Commissioner of Social Security
as to any fact, if supported by substantial evidence, shall be
conclusive . . . ."  42 U.S.C. § 405(g).  "It is the function of
the Secretary, not [the reviewing courts], to resolve
evidentiary conflicts and to appraise the credibility of
witnesses."  *Aponte v. Sec'y, Dep't. of Health & Human Servs. of
U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (alteration in original)
(quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d
638, 642 (2d Cir. 1983)).  A district court "may not substitute
its own judgment for that of the Secretary, even if it might
justifiably have reached a different result upon a de novo
review."  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)
(quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d
1037, 1041 (2d Cir. 1984)).

## III. Application

### A.    The ALJ Properly Applied the Treating Physician Rule

Plaintiff contends that the opinions of Drs. Gray and
Bhatt, Zetino's treating sources, preclude a finding that Zetino

45

was capable of performing the full range of light work. (*See* Pl. Mem. at 7.) Plaintiff's argument is meritless because in making his RFC findings, the ALJ properly concluded that the treating physicians' opinions lacked sufficient support and were contradicted by substantial evidence in the record.

Dr. Gray noted on Workers' Compensation forms that Zetino was totally disabled due to cartilage damage in his right knee. (Tr. at 188-92.) Notably, these forms only covered the period from October 2000 to May 2001 and did not provide any insight as to Zetino's capacity for work after that date. (*See id.*) In addition, despite the issuance of subpoenas by the ALJ to obtain examination treatment notes from Dr. Gray, no such records were provided and the record was therefore devoid of any evidentiary support for Dr. Gray's conclusion of total disability. (*See id.* at 21, 660-69.) Moreover, a treating physician's statement that the claimant is disabled is not binding on the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) ("A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant] is disabled."); *Snell*, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative"). Nor is a physician's conclusion that a claimant is disabled for purposes of New York State Workers' Compensation benefits

46

binding on the ALJ because the standard for disability under the Workers' Compensation program differs from the Social Security Disability program.  *See McEachin*, 2010 WL 626820, at *10 ("New York Workers' Compensation Law and the [Social Security] Act define disability in two different ways, which only sometimes are mutually inclusive.").  Thus, because Dr. Gray's opinion was limited in time, unsupported by the objective medical evidence in the record, and conclusory, the ALJ was justified in not affording controlling weight to his opinion.

The ALJ also declined to afford controlling weight to Dr. Bhatt's assessments of Zetino, finding that they were contradicted by substantial evidence in the record.  (*See* Tr. at 29-30.)  The ALJ refused to credit Dr. Bhatt's May 23, 2003 statement that Zetino could stand or walk for less than two hours and sit for less than six hours per day, (*id.* at 163), because this assessment was based in part on unsubstantiated and undocumented diagnoses of cervical and lumbar radiculopathy and diabetic neuropathy.  (*Id.* at 29; *see also id.* at 161.)  On the contrary, the ALJ noted, the "extensive hospital record provided by Queens Hospital" did not indicate that Zetino had radiculopathy, and the hospital record "repeatedly noted that [Zetino] did not have diabetic neuropathy."  (*Id.* at 29.)  The ALJ also did not find reliable Dr. Bhatt's opinions expressed in his May 9, 2005 assessment of Zetino's work-related limitations,

47

because that assessment relied "not only [on Zetino's] knee and shoulder derangements, but also [on] diabetes with neurological deficits and peripheral neuritis, conditions that [Dr. Bhatt] did not evaluate." (*Id.* at 25; *see id.* at 185-86.)  Further, the ALJ noted that Dr. Bhatt failed to support with medical evidence his finding that Zetino had environmental limitations. (*Id.* at 25; *see id.* at 186.)

     The ALJ noted that the opinions of other examining physicians were inconsistent with Dr. Bhatt's and Dr. Gray's conclusions that Zetino was disabled.  (*See id.* at 28-29.)  In particular, during a February 26, 2002 examination, Dr. Koyen found Zetino to have "reasonably good range of motion" in his right knee and "no neurological deficits." (*Id.* at 28; *see also id.* at 130, 132.)  Dr. Seo's June 10, 2003 report also contradicted Dr. Gray's and Dr. Bhatt's conclusions.  (*See id.* at 148-49.)  Dr. Seo observed that during his examination, Zetino "had no difficulty standing up from the sitting position and had no difficulty getting on and off the examination table." (*Id.* at 148.)  Dr. Seo also found, pursuant to his examination, that Zetino's sitting, standing, walking, bending, lifting, and carrying heavy objects was only "slightly limited." (*Id.* at 149.)[30]  Dr. Balinberg found on June 10, 2003 that Zetino only

---

[30] Although Dr. Seo noted that Zetino's cane was "probably nonweightbearing" (Tr. at 148), the court disregards this unexplained supposition.

had "some restriction in his ability to do heavy physical activities," such as lifting, carrying, pushing, and pulling heavy loads and Zetino had no "significant neurological abnormalities." (*Id.* at 151.)

The ALJ also noted that Dr. Bhatt's restrictive assessment was inconsistent with the reports from numerous examinations conducted at the QHC between 2003 and 2005, as well as Zetino's prescribed treatment, which consisted primarily of physical and occupational therapy and NSAIDs. (*See id.* at 29.)

Finally, the ALJ was justified in not affording controlling weight to the Workers' Compensation forms submitted by Dr. Bhatt for the period from March 2002 through July 2005. (*Id.* at 637-60.) Notably, other than a December 5, 2003 form — of which two different versions appear in the record, one neglecting to assess Zetino's capacity to work (*id.* at 187) and the other indicating total disability (*id.* at 644) — Dr. Bhatt did not assess Zetino's capacity to perform his regular work duties until May 2004. (*See id.* at 627-48.) From May 2004, Dr. Bhatt found that Zetino had a "total" disability and was unable to do any type of work due to his right knee impairment. (*See id.* at 649-53.) Subsequently, however, from February to July 2005, Dr. Bhatt indicated that Zetino had only a "partial" disability from his regular work duties. (*See id.* at 655-59.)

Such inconsistent findings render Dr. Bhatt's opinion less controlling or reliable, as the ALJ determined.

Thus, because Dr. Gray's and Dr. Bhatt's opinions are inconsistent with the opinions of other examining physicians and are not supported by the objective medical evidence in the record, the ALJ appropriately refused to afford controlling weight to those opinions. *See Snell*, 177 F.3d at 133. Further, the ALJ complied with his duty to "comprehensively set forth reasons" for his decision not to give controlling weight to the treating physicians' opinions. *Halloran*, 362 F.3d at 33; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

**B.  The ALJ's Finding that Zetino Could Perform the Full Range of Light Work on a Sustained Basis Was Supported by Substantial Evidence in the Record**

In his September 12, 2008 decision, the ALJ found that Zetino "had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. [§§] 404.1567(b) and 416.967(b)."[31]  (Tr. at 20.)  Plaintiff argues that the ALJ erred

---

[31] The regulations define "light work" as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b), 416.967(b).  "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular

by finding that Zetino had the RFC to perform the full range of
light work, rather than sedentary work, as the ALJ had
previously found in his April 27, 2006 decision.  (Pl. Mem. at
6-7.)[32]  Plaintiff further contends that "even if [Zetino] could
perform such activity for brief or intermittent periods, he
manifestly lacked the capacity to perform such work on a
sustained or regular basis."  (Pl. Mem. at 7.)  Because the
ALJ's finding that Zetino could perform the full range of light
work is supported by substantial evidence, plaintiff's argument
fails.  *See* 42 U.S.C. § 405(g) (An ALJ's findings of fact are
conclusive so long as they are supported by substantial evidence
in the record).

---

and continuing basis' means 8 hours a day, for 5 days a week, or an
equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996);
*see also Mardukhayev v. Comm'r of Soc. Sec.*, No. 01-CV-1324, 2002 WL 603041,
at *6 (E.D.N.Y. Mar. 29, 2002) (quoting SSR 96-8p).  The ALJ acknowledged
that "[a]n individual's residual functional capacity is his ability to do
physical and mental work activities on a sustained basis despite limitations
from his impairments."  (Tr. at 19.)  Thus, in determining that Zetino
retained the capacity to "perform the full range of light work as defined in
20 C.F.R. 404.1567(b) and 416.967(b)," (*id.* at 20), the ALJ implicitly found
that Zetino could perform such work on a sustained basis.  *See Mardukhayev*,
2002 WL 603041, at *6 (finding that "the claimant's residual functional
capacity to do his past work . . . was not supported by substantial
evidence," in part, because the "ALJ did not determine, explicitly or
implicitly, whether the claimant had the capacity to work on a regular and
continuing basis" (internal quotation marks omitted)).

[32] Plaintiff also argues that, after finding in his April 27, 2006 decision
that Zetino had the RFC for "less than the full range of sedentary work,"
(Tr. at 60), the ALJ subsequently "fabricate[d] a residual functional
capability for greater than sedentary" in order to render another unfavorable
opinion.  (Pl. Mem. at 6.)  In remanding the case to the ALJ, however, the
Appeals Counsel vacated the ALJ's April 27, 2006 decision.  (*See* Tr. at 85.)
This means that the earlier decision has no effect and the ALJ must issue a
new decision.  *See also* Social Security Administration, Hearings, Appeals,
and Litigation Law Manual Chapter I-3-7-1 (Sept. 8, 2005) ("A remand order
requires an ALJ to issue a new decision.").

Substantial evidence in the record supports the ALJ's finding that Zetino's right knee injury did not preclude him from performing light work.  Zetino had a stable gait, normal muscle strength, and his heel, toe, and tandem walking were marked "adequate" by Dr. Koyen in his February 26, 2002 assessment.  (Tr. at 133.)  Although Zetino had arthroscopic knee surgery on October 8, 2002, (*id.* at 842-43), in a March 7, 2003 examination, his knee alignment was good and he was observed as "doing well" despite some tenderness and swelling, (*id.* at 173).  In a June 10, 2003 assessment, Dr. Seo found that Zetino's knee joint was stable and he could heel and toe walk and squat half way down.  (*Id.* at 148.)  Dr. Seo diagnosed Zetino with "[m]ild degenerative osteoarthritis of the right knee, probably psoriatic" and found that Zetino's ability to sit, stand, walk, bend, lift, and carry heavy objects was only "slightly limited" because of "aching pain of the right knee and back."  (*Id.* at 149.)  Dr. Balinberg also noted in his June 10, 2003 examination that Zetino had the "[f]unctional capacity to do work related activities" and that Zetino had only "some restriction in his ability to do heavy physical activities like to lift, to carry, to push and to pull heavy loads."  (*Id.* at 151.)  A June 11, 2003 x-ray of Zetino's right knee revealed "no evidence of acute fracture, dislocation or destructive bony lesion."  (*Id.* at 147.)  Moreover, Dr. Lombardi, a medical

52

expert, testified that Zetino's reduced range of motion in his right knee was not functionally limiting.  (*Id.* at 810.)

There is also substantial evidence in the record to support the ALJ's conclusion that Zetino's right shoulder injury did not preclude him from performing light work.  The ALJ noted that, while Zetino had a supraspinatus tear in his right shoulder joint and he had "some limited range of motion" in that joint, he did not undergo surgery for his shoulder (as he had for his knee), and instead was treated only with physical and occupational therapy, at which his attendance was "spotty." (*Id.* at 28; *see also id.* at 220, 274.)

Substantial evidence in the record also supports the ALJ's finding that Zetino's other impairments did not preclude him from performing light work.  Regarding his hepatitis C, a November 18, 2003 medical report indicated that Zetino's liver function tests were "mostly normal" and there were "no signs apparent currently on phys[ical] exam."  (*Id.* at 584.)  On February 24, 2004, Zetino's hepatitis C and liver function tests were deemed "OK."  (*Id.* at 516.)  On May 25, 2004, Zetino's hepatitis C viral load was "very low," (*id.* at 368), and on June 23, 2004, his hepatitis C was deemed "undetectable," and medical records indicated that "no follow up [was] needed" at that time, (*id.* at 257).  On November 26, 2004, his viral load was still low.  (*Id.* at 410.)

Although Zetino did suffer from esophageal varices, (*id.* at 229), physicians at the QHC noted on November 18, 2003 that this was "not apparently [an] active prob[lem]," (*id.* at 584).

With respect to Zetino's uncontrolled diabetes, the record does not indicate that he suffered any organ damage, vision loss, or neuropathy resulting from this impairment. (*See* Tr. at 597, 551, 518, 373, 432, 434, 438; Def. Mem. at 34.)

In addition, Zetino complained of chest tightness only during intercourse or strenuous work. (*Id.* at 230.) A May 20, 2004 report after a cardiac catheterization indicated that Zetino had normal coronary arteries, normal left ventricle systolic function, no mitral regurgitation, and no aortic stenosis. (*Id.* at 231.) Additionally, Zetino's April and July 2005 cardiac examinations and a June 2005 echocardiogram were normal. (*See id.* at 423, 427, 431, 437, 442.) Zetino's hypertension was repeatedly noted as being under control. (*See id.* at 368, 433, 457.)

Finally, there are no allegations that Zetino's psoriasis affected his capacity to work. (*See* Def. Mem. at 34.) Thus, the record contains substantial evidence to support the ALJ's finding that Zetino could perform light work.

The court notes that Dr. Goldman, the medical expert who testified at the ALJ hearing on February 24, 2006, stated

that "between [Zetino's] shoulder problem, his knee problem, and his [other] medical problems, he is not able to, in my opinion, work." (*Id.* at 869.)  A statement by a medical source that a claimant is disabled, however, is not binding on the ALJ.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  Further, the opinion of a nonexamining source, such as Dr. Goldman, must be evaluated in the same manner as those of examining sources.  *Id.* §§ 404.1527(f), 416.927(f).

The ALJ found Dr. Goldman's testimony to be "broad, general, and lack[ing] specificity." (Tr. at 30.)  Indeed, during his testimony, the ALJ repeatedly asked Dr. Goldman to be more specific in his testimony and to refer to specific documents in the record. (*See id.* at 870, 871, 872, 879.)  The ALJ also found some of the bases for Dr. Goldman's conclusion that Zetino was unable to work to be unsupported. (*See id.* at 30.)  For example, although Dr. Goldman stated that "decompensation of the heart was a concern," (*id.* at 869), the medical record indicates that Zetino had no cardiac abnormalities, (*see id.* at 231).  Similarly, although Dr. Goldman stated that Zetino's "diabetes was a concern regarding his right shoulder," (*id.* at 869), the ALJ correctly noted that Zetino did not experience any organ damage secondary to his uncontrolled diabetes, (*id.* at 30).  Further, although Dr. Goldman stated that "even sitting would be compromised due to

[Zetino's] knee," when asked by the ALJ for the basis of this conclusion, Dr. Goldman admitted that his assessment was simply "supposition because of the fact that I don't have [Zetino's knee surgery] follow-up information." (*Id.* at 878.)  As the trier of fact, the ALJ was entitled to discount Dr. Goldman's testimony in favor of medical evidence in the record supporting a finding that Zetino retained the ability to do light work. *Richardson*, 402 U.S. at 399 (noting that it is the ALJ's duty to resolve conflicts between medical evidence).

The ALJ also considered Zetino's own testimony about his subjective complaints and limitations, and found that, "based on the medical findings," Zetino was not entirely credible.  (Tr. at 27-28.)  A claimant's subjective symptoms alone are insufficient to establish that the claimant is disabled under the Act.  *See* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996) ("No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.").  Rather, the claimant's "impairment must be compared to objective medical evidence to determine whether a disability exists.  If . . . the symptoms that [the claimant]

complains of are greater than the restrictions that can be demonstrated by the objective evidence, additional factors must be examined." *Kendall v. Apfel*, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998) (internal citations omitted); *see also* 20 C.F.R. §§ 404.1529(a)-(c), 416.929(a)-(c).  Social Security Regulation 96-7p sets forth seven factors that an ALJ must consider in determining the credibility of a claimant's statements about his or her symptoms and the effects of his or her impairments:

> (1) The individual's daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Wright v. Astrue*, No. 06-CV-6014, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008).  Where the ALJ fails sufficiently to explain a finding that the claimant's testimony was not entirely credible, remand is appropriate. *See, e.g.*, *Tornatore v. Barnhart*, No. 05 Civ. 6858, 2006 WL 3714649, at *6 (S.D.N.Y. Dec. 12, 2006) (remanding because the

ALJ considered some, but not all, of the seven factors set forth in SSR 96-7p).

Here, the ALJ took into account these factors when determining that Zetino's subjective testimony and complaints were not credible. In particular, the ALJ noted that Zetino engaged in a "reasonable range of daily living activities," was "independent in self care," and was even able to travel to Guatemala for two months in 2004. (Tr. at 28; *see also id.* at 118, 121, 411, 852-53.) The ALJ also noted that Zetino was also able to go to Atlantic City. (*Id.* at 23; *see also id.* at 222.) The ALJ also considered Zetino's various complaints of pain and found that they lacked support in the medical record. (*Id.* at 27-28.) The ALJ noted that Zetino's treatment was conservative, his medications were "not unusual for either type or dosage," and although he was prescribed physical therapy, "his attendance at scheduled sessions was spotty." (*Id.* at 28.) Further, the ALJ noted that Zetino did not use a cane at his August 2005 hearing. (*Id.* at 29.) Thus, the ALJ's finding that Zetino's testimony and subjective complaints were not credible is adequately explained based on substantial evidence in the record. *See Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (affirming ALJ's determination that claimant could perform light work where the ALJ found the claimant's subjective complaints of pain were not credible).

In sum, the ALJ's finding that Zetino could perform the full range of light work is supported by substantial evidence. *See Mancuso v. Astrue*, 361 F. App'x 176, 178-79 (2d Cir. 2010) (finding substantial evidence to support the ALJ's determination that claimant could perform light work despite claimant's subjective complaints of pain and a psychiatric assessment indicating that claimant suffered "serious impairment in social and occupational functioning" (internal citation omitted)); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner.").

**C.   The ALJ Properly Determined that Zetino Could Make an Adjustment to Other Work**

At the fifth step of the Commissioner's analysis, the burden shifts to the Commissioner to show "that there is work in the national economy that the claimant can do." *Arruda*, 2010 WL 324002, at *2 (quoting *Poupore*, 566 F.3d at 306).   The ALJ satisfied this burden by relying on the Medical Vocational Rules contained in 20 C.F.R. Part 404, Subpart P, Appendix 2. *See* 20 C.F.R. §§ 404.1569, 416.969 ("[I]f the findings of fact made about all factors are the same as the rule [in Appendix 2], [the Commissioner uses] that rule to decide whether a person is

disabled."); SSR 83-11, 1983 WL 31252, at *1 (Jan. 1, 1983)

("Each rule directs whether a work adjustment is possible . . .

.  The criteria of a rule are met only where they are exactly

met.  Where the criteria of any rule are not met, a decision is

not directed [and] . . . the rules are used, in conjunction with

the definitions and discussions provided in the text of the

regulations, as a framework for decisionmaking."); *see also*

*Heckler v. Campbell*, 461 U.S. 458, 467 (1983) ("We do not think

that the Secretary's reliance on medical-vocational guidelines

is inconsistent with the Social Security Act."); *Bapp v. Bowen*,

802 F.2d 601, 604 (2d Cir. 1986) ("In the ordinary case the

Secretary satisfies his burden by resorting to the applicable

medical vocational guidelines.").

Here, the ALJ found that Zetino had the RFC to perform

"the full range" of light work, (Tr. at 20), and as discussed

above, this finding is supported by substantial evidence.  The

ALJ also determined that Zetino was a "younger individual," as

he was 41 at the time of his alleged disability onset date.[33]

(*Id.* at 31.)  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) ("If [the

claimant is] a younger person (under age 50), [the Commissioner]

generally [does] not consider that [the claimant's] age will

---

[33] The ALJ properly used Zetino's age, 41, at the time of his disability onset
date for purposes of this analysis.  (*See* Tr. at 31); *see also VanBuren v.
Astrue*, No. 09-CV-6233L, 2010 WL 3238529, at *6 (W.D.N.Y. Aug. 13, 2010)
(using claimant's age at the time of her disability onset date).  Further,
Zetino qualified as a "younger individual" throughout the disability period,
up until his death on June 26, 2009 at age 47.

seriously affect [his] ability to adjust to other work.").
Because Zetino had a RFC for the full range of light work and
was a "younger individual," the ALJ properly applied Rule
202.18, which directs a finding of "not disabled."  *See id.* Part
404, Subpart P, app. 2, R. 202.18.

Plaintiff contends that the ALJ erred in finding that
Zetino was able to communicate in English and had transferable
skills.  (*See* Pl. Mem. at 6.)  The court need not address these
arguments, however, because a conclusion of "not disabled" would
still be appropriate under the Medical Vocational Rules even if
the ALJ had found that Zetino was illiterate and had no
transferable skills.  *See* 20 C.F.R. Part 404, Subpart P, app. 2,
R. 202.16 (directing a finding of "not disabled" for a "younger
individual" with a RFC of light work who is "illiterate or
unable to communicate in English" and who is "unskilled" or has
no previous work experience).[34]

In sum, the ALJ properly found that jobs existed in
significant numbers in the national economy that Zetino could
have performed during the relevant period, and, thus, Zetino was
not disabled under the Act.  (*See* Tr. at 31–32.)

---

[34] Plaintiff also argues that 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule
201.18 is "strange, arbitrary and improper." (Pl. Mem. at 4.)  Because the
ALJ found that Zetino had a RFC of light work and applied Rule 202.18, the
court need not address this argument.

## CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the pleadings is granted and plaintiff's cross-motion for judgment on the pleadings is denied.  The Clerk of Court is respectfully requested to close the case and enter judgment in favor of the defendant.


**SO ORDERED.**

Dated: February 3, 2012
       Brooklyn, New York


                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York